Case number 24-1048. Estate of Joseph A. Insinga deceased by Amanda Gilmour, personal representative, appellant versus commissioner of internal revenue. Mr. Muhammad for the appellant, Ms. Aveda for the appellee. Good morning, your honors. May it please the court, husband Muhammad for appellant, the estate of Joseph Insinga. Your honors, without repeating our briefs, there are three points that I think the panel should consider when deciding this appeal. First, what was the IRS trying to prove with respect to the transactions? The IRS was trying to prove that the factoring transactions were really just a loan from the Dutch bank to the corporate taxpayers, X Corp and V Corp. Two, what evidence did the IRS use to prove that the transactions were just a loan? The most direct evidence was the Dutch bank credit applications, which were basically a confession that the transactions were just a loan. Three, who did the IRS exam teams try to prove this to? The IRS exam teams tried to prove this to IRS appeals. They were the ones who persuaded the taxpayer to settle the case. And the appeals case memos for IRS appeals really demonstrate that IRS appeals relied on the whistleblower material in pushing the taxpayers to settle. In the appeals case memos evaluation sections, appeals says that the government's position is stronger on economic substance than the taxpayer's position. And in describing the government's position, appeals starts by discussing internal Dutch bank credit applications. And if there's one thing that the panel does before deciding this appeal, we ask that the panel please read the appeals case memos where the Dutch bank information is discussed. And we cite the relevant passages of the appeals case memo in our opening brief. And that's also especially important because the form 11-369s, which were the evaluation reports by the IRS submitted to the whistleblower office in this case, were submitted before this case went up to IRS appeals. And so the whistleblower office had evaluation reports from the IRS exam teams, but the whistleblower office never had any sort of form 11-369 evaluation reports from IRS appeals itself. And the appeals case memos are really the only evidence that we have regarding how appeals used and relied on and looked at. Where are those in the record? The appeals case pages at the tip of my fingertips, but we cite the relevant passages of those appeals case memos in our opening brief, your honor. Isn't the most important document though this 2007 presentation made within the IRS? Because the real question is not what you contributed. It's what you contributed above and beyond what the government already knew. There's no dispute that the government was looking into this transaction. They had to figure it out. In their view, there was no economic substance to these transactions. They had worked all of that out. Yes. That was their position, but it's one thing to take that position. It's another thing to prove it. And to prove it, they had to prove this basically to IRS appeals. And when they were I didn't hear that. They had to prove it to IRS appeals. That's who they were ultimately trying to persuade, both IRS appeals and the taxpayers. And to persuade both of those entities, they cited in their economic substance notices of proposed adjustments to the Dutch bank credit applications in the argument section of those note posts. That's the very first thing that notwithstanding that they'd accumulated all this other evidence over the years in investigating these entities. That's the first thing that they cited to. And it makes sense because that's the most persuasive evidence. Persuasive evidence that there's a lack of economic substance? Persuasive evidence that these transactions were really just a loan. How does that establish lack of economic substance? It establishes lack of economic substance because the taxpayer's position to the IRS was that these were legitimate bonafide factoring transactions. They were investments by the Dutch bank into securities issued by these offshore special purpose vehicles. The offshore special internal Dutch bank credit applications basically established that no, that's not what these transactions were at all. These were just a loan. Correct me if I'm wrong, is that they didn't look just at how the Dutch bank viewed the transaction because the credit application just showed that the Dutch bank viewed this as a loan. But they were saying the entire setup didn't make economic sense. And that wasn't just based on how the Dutch bank viewed the loan because that's all the credit application shows. There was just a lot more to it. They were looking at the entire structure and the way it all worked and it just didn't make economic sense. And it seems that the credit applications went to one small sliver of one aspect of the analysis on economic substance. But that's the sliver that they chose to present front and center in their argument section. And they use that sliver. But where they put it doesn't seem to mean that he substantially contributed. He has to substantially contribute, we agree. He does have to substantially contribute. And he substantially contributed because the ultimate conclusion in the economic substance notices of adjustment is that the transaction was just a loan. And the conclusion in the chief counsel advice memo was that this was just a disguise for a loan. And they cite to the Dutch bank credit applications as their evidence. But that's one part of the whole economic substance. It is one part of the whole. Whether it's a loan or not. There's all this other stuff. But this whole structure doesn't make sense. Like who's benefiting from this? There's no reason to do this except to get a tax benefit. There's more than just how one party to the transaction, which isn't even the taxpayer, the Dutch bank, views this particular aspect of the problem. So the fact that the Dutch bank viewed this as just a loan speaks to, and they cited this in their notice of proposed adjustment, it speaks to their stated, the taxpayers' stated business purpose. The taxpayers' stated business purpose, the IRS found in prior audit cycles that that was something that we really couldn't refute. So even if you may be right, it's a deferential standard of review we have here too. And it just seems to me, I'm wondering, like is there room for some deference? And this is a pretty complicated tax transaction. WBO, tax court have more expertise in these matters than we do. And I know we review the tax court de novo, but WBO seems, is reviewed for abuse of discretion. They seem to understand tax better than I do. Isn't there some room for deference for their assessment that this did not substantially contribute in light of everything that was before the WBO? Not in this case, your honor. And that's because the wrong legal standard was applied by the whistleblower office. The whistleblower office relied on the 2012 proposed regulations, which even the IRS agreed later on. And if we don't think that they did, just putting that aside for a moment. Yes, your honor. It's a deferential standard of review. If we don't think that they applied the wrong legal standard, then even if you have a good point, we should defer to the way they assess these facts if it's not wrong. Well, it is a de novo standard of review. The tax court's summary judgment determination is a de novo standard of review, your honor. So I don't think there's- De novo as to the tax court, but not as to the whistleblower office. I'm sorry, say that again, your honor? Not as to the whistleblower office, right? The tax court is deferentially reviewing the whistleblower office. Correct. The tax court is deferentially reviewing the whistleblower office. We're just looking through their decision to deferentially review what the WBO did. That's correct, your honor. That's correct. Back to Judge Pan's question about- Yes, but you can't sustain the whistleblower office's determination in this case when the whistleblower office is relying on a 2012 proposed regulation. No, and I understand that. Before we get to that argument, if we don't think that they applied the wrong standard, then we would just defer to what they did. No, your honor, because the whistleblower office, when it made its determination, was also unaware of material facts. So the whistleblower office's determination is unsustainable for two reasons. Number one, they applied the wrong legal standard, and it can't be sustained using the 2014 regulations because they never applied those regulations. They weren't in effect at the time. And the 2014 regulations have irreconcilable conflict with the 2012 regulations. So you're just relying on those two claims of error, then? Otherwise, they acted within their discretion. The WBO acted within its discretion, but for these two asserted claims, because that narrows our analysis significantly. I don't think you can say that they acted within their discretion when applying the wrong legal standard and when they're unaware of material facts. Right, so you're only relying on those two claims. That's what we're relying on. That's the way we view this case. Yes, your honor. I don't think there doesn't appear to be any dispute in the record that Mr. Nsingha's information was helpful. Yes. And the question really is here the adjective substantial. Substantial contribution. And put aside your argument about legal error on how they measured whether it was substantial or not, because a tax court applied regular substantial contribution. I'm not dismissing it. I'm just saying I'm trying to understand how to think about this. If we were to decide that there was not a legal error, which always vitiates everything, is whether the contribution was substantial that question? I know you say it's relevant. Yes, so there are a couple of points here. The whistleblower office never applied a substantial contribution test. So right from the get-go, they were applying the wrong test. And the tax court can't salvage the whistleblower office determination by, after the fact, trying to apply a substantial contribution test. I understand. Our point is, yes, we believe that there was substantial contribution. There was substantial contribution because the Dutch bank credit applications are cited as evidence for the ultimate conclusion of the economic substance adjustments, which was that the transactions were really a disguised loan. Is whether it went from helpful to substantially contributing? Is that a fact question? You know, what role did this information play in how this case went forward? Feels to me like, which is really what this case seems to be about, because they don't say, oh, it was garbage. We never needed it. They used it. And you've cited a lot of things that show they're like, oh, great, this is helpful. But we have to, we would have to determine that there was error in finding that it was not substantial contribution. And so I'm going to ask one more time that question in this case, putting aside, I got your arguments. And when I say put aside, it doesn't mean I'm resolving them against you at all. I'm just trying to categorize the decisions we have to make. When we get to this stage, was it helpful or substantially helpful? And I'm using that for contribution. Substantial in its helpfulness. Is that a fact question? That is a fact question. And it was never properly evaluated. I get it. I get you have your argument that it wasn't evaluated both for legal error and record. Yes. Right. OK. But just just to understand that it's a fact. Yes. Yes. And, you know, they they they definitely cited the information that was provided. They liked it as part of their opening montage. But you can imagine another case where there's 800 pieces of evidence that the IRS points to and a different whistleblower comes along and provides one piece. I know you did more than one. This is a hypothetical. Provides one piece. And it's the first piece they talk about. Would that mean by itself make it a substantial contribution or or do we through the tax court, through the W.B.O. have to look at its role and sort of the ultimate outcome of the case? I think the whistleblower office has to look at its role in the ultimate outcome of the case. It has to look at its substantial contribution. Of course, our position is that test was never properly applied here. Sure. And then and your position, I think, also is that if it was applied, your your client would be a state would prevail. Absolutely. OK. And then can you explain to me again how? Because even if this is a loan. Loans can have economic substance to it. Right. Most loans do have economic substance to them. Yes. So showing that this was a loan, how does that and this is my ignorance of tax law, to be clear. I'm being honest with you. How does that. Contribute to their determination, which at the end of the day, what the horse they rode on was economic lack of economic substance, and that's what caused the taxpayer to fold or to compromise and pay. Explain to me how the status of it being a loan. Is a substantial part of determining that there was a lack of economic substance? Because the substance of the transaction is one thing. If it's a factoring arrangement, which is what the whistle, which is what the taxpayer was telling the IRS, it's a factoring transaction. That's the substance of the transaction. It's a legitimate factoring transaction. We get these particular tax break based on the fact that it's a factoring transaction. The irises position was, no, it's not a factoring transaction. It's a loan. The tax breaks you get, the deductions you get are entirely different when it's alone. And that's what the IRS was trying to prove was that it was a loan. And the documents that the IRS got from the taxpayer went to the IRS, went to the taxpayers position that this was a factoring transaction. I thought that we didn't have to get into the details of the transaction. If your claim of the abusive discretion is simply that they applied the wrong legal standard, or they misunderstood the facts, we could just focus on those two claims. Because I will tell you, I feel uncomfortable trying to wade into this whole tax transaction and deciding what was substantial and not and deciding this is economic. It just seemed to me that you had agreed that your only claims to support your claim of abusive discretion were, number one, they applied the wrong legal standard because they relied on the proposed rule standard and not the final rule standard. And number two, they misapprehended the fact. They didn't know that the credit application came from your client as opposed to from another source. That's correct, Your Honor. So we just focus on those two things and not figure out what this whole transaction meant and how important this was, correct? We can certainly do that, Your Honor. So with respect to the 2012 proposed regulations, they limited the circumstances under which the whistleblower statutes requirement that the IRS proceed based on whistleblower information. They limited that statutory phrase to only three circumstances, which is when the whistleblower's information causes the IRS to initiate an action, expand the scope of an action, or continue to pursue an action that it otherwise would not have done. So my understanding is that that you can only look at those three things. Correct, Your Honor. Whereas in reality, the final rule and the standard is that those are just examples. Those are just examples. But your argument that they applied this erroneous proposed standard is kind of what you glean. Like, they never say outright that we're applying this standard and we're applying it as an exclusive way, but you infer that. So we have to look at what they said, and I agree there's some sentences that seem to suggest that, but we have to look at the entire process that they took, which doesn't seem to focus only on those three things. So we can be reasonably sure that they applied the standard, and here's why. Because in denying the award, they cite to, they parrot that same language as the basis for denying an award. At the time that they denied an award, in April 2013, the only regulations that were in effect were the proposed 2012 regulations. And the only place where these three factors, this three-pronged test appeared, was in the proposed regulations. But the overall analysis didn't just focus on those three things, and if they were taking an only approach, that's all they would have had to address. Right, but it affected their view of everything else. When they said, when they recognized that one of the IRS exam teams said that this information was helpful, they said to themselves in their analysis, yeah, but even though they said it was helpful, it doesn't fit within one of these three buckets, so we can't give an award. And then the other thing I would say as to the irreconcilable conflict, and we do talk about this in the brief, under the 2014 regulations, those three factors are now just examples of when the IRS does proceed based on whistleblower information. So because they're just examples, you can only use those three factors as a basis for granting an award. You can't use those three factors as a basis for denying an award, because if you're using them as a basis for denying an award, then once again, they're an exclusive three-factor test. Yeah, and Judge Katz mentioned the slide deck, which is relevant to X Corporation. Yes, Your Honor. And the slide deck at the end has a number of sort of questions for discussion, discussion questions, and, you know, and the discussion questions are, you know, questions we still want to answer, I take it. None of them seem to me to be, how did the Dutch Bank treat this money? It doesn't seem to me that they're saying that the information you were able to provide was what they were still missing or trying to pin down. Yep, they were unaware of it until, even though they were unaware of it, but they did, there are some later emails in which they're saying we're trying to pin down how the Dutch Bank treated this transaction. What can we do? What should we do? Right, and they say that's for this equity debt approach as opposed to the economic substance. Yes, and I'm happy. Yeah, like I need waiters on, I'm going in so deep here on what I don't quite understand about tax law, but if, do we, to answer that fact about substantiality of the contribution, we need, do we need evidence that they, that understanding the Dutch Bank treated this as a loan was a big breakthrough for the economic substance analysis? And we have that evidence in terms of how they characterize the Dutch Bank credit applications in the argument section of the notices for adjustment. They use the Dutch Bank credit applications to, one, refute the stated business purpose of the taxpayers. Business purpose is one of the two factors in economic substance. They use it, two, to show that the Dutch Bank treated as a loan, and if you're showing that the Dutch Bank treated as a loan, that necessarily means that the taxpayer recognized that it was a loan. The taxpayer is the one that's signing the credit applications and giving it to the Dutch Bank. I'm sorry, maybe this is my lack of understanding of tax law, but I thought they were talking about it's a loan between the taxpayer and the SPV. No. It's a loan, and that's part of the confusion. It's a loan between- I'm looking at the, I'm looking at one of the ACMs that you told me to look at, and it says the exam team concluded that the arrangement was a sham, and in substance, the true nature of the transactions represented a finance arrangement loan between the taxpayer and one of the SPVs. This is at A3663. So that might have been a misstatement. Wherever else you see them talking about the transaction, they say it's a sham transaction, and the true nature of the transaction is that it's a loan from the Dutch Bank to the corporate taxpayers, X Corp and V Corp, and that the SPVs were just sham entities that had to be disregarded. I mean, I'm just looking at what you told me to look at. That's not what it says. Okay. I'm hoping we can avoid some of the details as well. Sure. What is your understanding of the relationship between the economic substance inquiry and the, is it a loan inquiry? I had thought those were essentially the same question, because the question is whether all of these complicated transactions are what they purport to be, which is a sale of receivables for legitimate business reasons, or whether that purported sale of receivables is in reality just a loan, and those have different tax consequences. So I think- Is that oversimplified? So that's exactly the economic substance of the transaction, but I think your honor might be asking what's the difference between the economic substance theory and the debt versus equity theory. Yeah. The conclusion that this is in reality just a loan. Is that anything more than saying that what purports to be a bona fide sale of receivables slash factoring just has no substance? It was the same exact conclusion in both debt versus equity and economic substance, that the transactions were just a loan. That's how I understand it. The only difference was whether we disregard the structure of the transaction altogether, which is what they did with economic substance, or whether we keep the structure of the transactions, which means keeping in place these offshore special purpose vehicles. But we then have to deal, and then we recharacterize the underlying securities as debt instead of equity, but they decided not to do that because the chief counsel advice memo said, well, then you've got some other internal revenue code issues that you have to deal with, namely losses between related parties. We discussed that in put note eight of our reply brief. So the conclusion that it's debt by itself goes a long way toward proving no economic substance, but it's not the same thing. Correct. And that's only because it's whether you disregard the entire structure or whether you keep the structure in place. I think I got it. Thanks. Any other questions? All right. We'll give you a couple of minutes on rebuttal. Thank you, your honors. Who's Avetta? Did I say that correctly? Avetta? Thank you, your honors, and may it please the court, Julia Avetta for the commissioner. I think it was clear from before the receipt of the whistleblower information that the service suspected that this tax shelter, this tax avoidance transaction, was a disguise for a loan, and the inquiry was actually what disguise is it wearing, not what kind of a loan is it or to whom or. Well, they suspected, but suspected is not enough. Correct. And it is not. That's where you begin your investigation. That's not. Precisely. Enough. No, but so they suspected it was a loan. Yes. And you have you get gift wrapped to you evidence that this is, I mean, hard paper evidence that this is a loan. That is a bridge too far, your honor. That's not what happened. There was not gift wrapped evidence of a loan delivered here. What was delivered was information. There was. There was indicated. Credit application, which is a good sign. Someone's looking for a loan and other information and told you what things to go get from the Dutch bank. So respectfully, your honor, the taxpayers denied that they had applied for credit applications. The whistleblower suggested that we should ask for this information from the taxpayers. We did so. We did not receive it. And then as a follow up, we sought it directly from the bank and obtained it from the bank. Now, there was a factual question about whether the whistleblower provided that information initially. And in one case, it is resolved that he did. But that information was not recognized as coming from him or used in the time before it was also received from the bank. Regardless, the I want to I want to refocus the court on the actual process that was followed here. It was not a question of what the IRS was trying to prove to someone. It was, as you know, an investigation. They weren't seeking to prove anything to anyone. There was not some arbiter of fact. They were not preparing a case to take to appeals in an adversarial process and say, here is our position. Here's someone else's position. Be our judge. Tell us what the answer is. They were coming up with an adjustment. They were coming up with an audit position. And the audit position was, how can we tax this? How can we best capture the economic effect of this irreducibly complex transaction? And there were a number of theories that they were testing and they were testing them all before they received the whistleblower information, including them. But then they were able to prove that the whistleblowers explanation of what this transaction was, was false. Is Ken Ken shutting down? So there's one thing is affirmatively building, affirmatively building the IRS case. And then you have to do counter whatever innocent explanation the taxpayer is going to proffer. That's just how one proves matters. If whistleblower information is powerful, it's shutting down the taxpayer's counter. And so then your affirmative case sort of go forward. Although I think it was like described as a 50-50 case. Then why is shutting down the taxpayer's innocent explanation and at the same time corroborating suspicions and suggesting avenues and pointing to avenues of further investigation and further documentation? Why is that not a substantial contribution? Had it actually shut down the taxpayer's position? It probably would be. The only thing it did here was subvert the taxpayer's position that they had never actually applied for credit from the Dutch bank. It was evidence that they had, but that was not key to the economic substance determination. That was key to a characterization of how to characterize various securities in these entities created to facilitate this transaction. But also their argument is that this whole factoring theory flounders once you start realizing that this was paid out as a loan and applied to ask for as a loan paid out as a loan. Doesn't that blow a hole in their whole effort to demonstrate this was some sort of legitimate factoring? To the extent that it does, and I'm not persuaded that that's the loan that is significant here. As Judge Pound observed before, there were different transactions that they were weighing through the lens of, is this a loan? Is this an investment? Is this debt or is this equity? How is this money changing hands? What is being received in return? Is this just collateral or are you obtaining equity in an entity, in a going concern? And there is necessarily, on a record like this, by design, there is ambiguity in that, because that's how these shelters managed to hide this activity, which we won't call economic substance, from taxation. What the whistleblower evidence provided was insight into, and the second part of your question there, did it corroborate a theory? Yes, it absolutely did. And it was for that that it was cited, which was that this was not an equity investment. This was a loan. This was the bank extending credit in exchange for collateral, not purchasing equity and obtaining a stake in an entity. And that was the 13-factor test that the whistleblower information did cause the IRS to change its mind on one factor about. But that theory was jettisoned. That theory was not the basis for the ultimate adjustments. They were thinking about it before they received the whistleblower information. It was discussed prior to the March 2007 meeting. It was discussed at the meeting. What I'm struggling with is, you say, suspecting and thinking about, looking into, none of which seemed to me at all inconsistent with, and then information came along that brought us a long way home, at least got us to third base. It seems to me, if the IRS's view is that as long as we were thinking about these transactions and had the theory, but not yet the evidence, all the evidence is needed, and giving us that evidence is not a substantial contribution. Is that your point? If that evidence were conclusive, it would be a substantial contribution. It has to be conclusive. You have just posited that it is. No, I did not get you home. All right. So, is your position that it has to be conclusive? That's an overstatement of the position. The position is it has to have an effect. It has to affect the outcome. And moving it to third base is an effect. And had the IRS proceeded on the debt versus equity theory, where there is a measurable effect in its position based on the receipt of whistleblower information, that would be a tougher challenge to push back and say it wasn't substantial. But here we know, and as you've observed, this is a deferential standard of review to the conclusions of the whistleblower office. We know that they concluded, based on this record, that the whistleblower information was at most a minor factor in the determination of economic substance that was far outweighed by the reality of these transactions themselves, which is exhaustively documented. That's your 800 pieces of evidence. Can you explain how the fact that this was a loan plays into the substantial effect argument? Because it seems to me that there was the debt versus equity thing. I think the fact that this was a loan, and the whistleblower information goes to whether it was a loan or not, also plays into the substantial economic effect argument. And I thought the argument was just that this is just one small piece of it. So can you explain why this is just one small piece of the substantial economic effect argument? So there are two... We're thinking of a loan in two different senses or two different phases. One is when the bank is participating in this transaction, what does it think it's doing and what does it think it's getting? What do the parties call it? What labels do they use? That's the debt versus equity theory. And the credit applications read in that context show that the bank thought that they were giving a loan, that this is debt. And the IRS had already concluded that they were going to view it through a debt lens based in part on that factor even before the whistleblower information tilted that factor in favor of debt. The second overarching conclusion is once you clear away all of the smoke and mirrors, what has actually happened here? Because money has changed hands. There is a transaction that happened. If it isn't a factoring entity, if it isn't an investment in these various structured vehicles, what is it? The answer there is a loan in disguise. So those are two different loans. One is what is the bank contributing to this transaction? And the other is what's left when you look through all of the subterfuge? Part of the subterfuge versus the underlying. It just seems to me that a more simple way to look at this is when you concluded or when the WBO concluded that this is one small part of the economic substance theory, it seems far more telling to me that the taxpayers kept the accounts receivable. It just seems that there are other things that seem so much more clear that this was not for any reason other than for the tax benefits than how Dutch Bank viewed the loan. So what I'm trying to get from you is what are the things that made it clear that this was not for an economic substance? In our brief, we cite the analysis that the exam team performed in the aggregate. It was more than simply looking at whether the bank treated its investment in the entity as credit or equity in the entity. There were... I remember general things saying like, oh, the whole structure of this, the way things are, we looked at all these things that made it clear this is an economic substance. That's right. But I just was trying to understand what are those things because it will give us some perspective on how important was this one particular fact. The IRS, in its investigation, considered the transaction documents and the agreements, a functional analysis of the accounts receivable process, a computation of cash outlay compared to the tax benefits that were received, whether the taxpayer and the factoring entity were truly investors in each other or had the subsidiary or investor relationship that they claimed, how their cash flows... Cash used to be the bottom line. Exactly. Like you just said. And who actually did have the accounts receivable at the end. All of these were factors that went to the economic substance of the transaction, not what the bank thought it was getting in exchange for its money. Now, the fact that when you eliminate all of the subterfuge, what remains is that the bank has tendered funds and those are in effect a loan, is concentric with the sense that the bank thought it was making a loan to this entity at the time. But you've disregarded the entity now. The loan is just what's left. Those are the funds that changed hands. I'm sorry, but that just sounds to me like you're saying, point one, the bank thought it was making a loan. Point two, the bank, in fact, was making a loan. To a different target. As a debt state rather than something else. The bank, the evidence that the whistleblower provided indicated that the bank did not, or did not indicate that the bank thought it was making an equity investment. And does that go to, I'm sorry. Seems to collapse the two. Seems to collapse the debt or equity question into the economic substance. It does not because the economic substance inquiry is not, as you observed earlier, concerned with what the bank thought. It's concerned with. No, but you're asking the same question. Did the bank think it had. Asking the same question of the bank. Yes. Question one, did the bank think it had a loan, had made a loan and therefore was holding debt? Question two, is that the substance of the transaction? And to put a finer point on that, did the bank think it was loaning money to the factoring entity? And then. I'm sorry. To the, to the, to the, one of the entities in the structure. The, in the tax shelter structure. SPV. I, I, I'm, I'm, I am, I don't recall which entity the bank was precisely contracting. But that ultimately went to its intent into participating in the transaction. But when that's disregarded, what's left is that the bank has effectively made a loan to the taxpayer, regardless of whom it thought it was extending credit to in the credit applications. But it's not just how the bank thought about it. You have a credit application from the corporation here. So you're actually, you're getting all this information, both about how the bank thought about it, but you got pretty powerful evidence of how the taxpayer thought about what they were doing, right? Which is why we changed our position on the equity versus debt subfactor. Because it, that goes exactly to that point that said, oh, you did your taxpayer. You were telling us that this was equity. But look, you told the bank you were asking for a loan. That's debt.  Taxpayer did. The tax, no, yeah, I didn't mean you personally. Yeah, yes, that's correct. That's good evidence. And that is good evidence. And, and, and caused a change of position. It's not that, it must be the other. Precisely. And it caused a change of position on the subfactor in the 13-factor test in the rejected theory. That was the effect of the whistleblower information. So there's no dispute here that the whistleblower information had effect. The reason there are two theories is not because they're conceptually distinct in terms of what the loan was. There are two theories because it has different tax consequences. That's right. And there were more than two theories. And in the presentation, they, they enumerate a number of them because they're still fleshing it out. They're trying to figure out how do we capture this? If you want to treat this as debt versus equity, then there are different deductions you can make for your tax returns. Correct. If we say there's no economic substance, then there's a whole different set of things you would do in terms of your taxes.  But the idea, the analytical idea that this is a loan as opposed to an equity investment, that's just a fact that could go into either theory. It is a fact that goes into, so the, it's, it's a particularly relevant fact in a debt versus equity analysis because you're trying to determine are you making a loan in the first instance or purchasing an equity stake in a corporation? It's a bigger factor in that. And in, but in, in a larger sense, in an economic substance inquiry, it goes to what Judge Millett flagged as the disingenuousness of the parties who are pretending that they're doing something that they're not. It just seems to me that for an economic substance theory, the question, overarching question is, is this really a factoring transaction at all? And that, and factoring would mean somebody's really buying your accounts receivable at a discount. And so the idea that whether the vehicle that's buying this has equity, which means it's a real entity goes into that versus whether it's financed with debt, which makes it seem more like maybe you're not an independent entity buying this factoring thing. But it just seems to me that the economic substance question, the bottom line of it isn't so dependent on that financing question so much as it just seems to me the most important evidence would be that they kept the accounts receivable and were using the accounts receivable as if they had never been factored. Yes, the theories there, we won't say that there's zero overlap in the theories. Obviously, all of these theories are dealing with the same record and the same evidence and the same types of transactions and coming at it from different angles in the code. And the best evidence of treating entities as functioning corporations in which someone can obtain an equity stake is going to be different best evidence, as you notice, from whether they had economic substance in the first place. So you will see overlap in the evidence here. It is much more salient and meaningful in the making of determinations that we didn't rely on than in the determination that we did. The whistleblower office recognized that there was, this was meaningful. Why can't there be a substantial contribution? If this put us on the right track, kept us from spending more resources and time pursuing something that was going to be a dead end. It did not. I'm asking, is this something, I mean, you said it sounds all right, we shouldn't go that way anymore. We're going to go back over here and shut down the taxpayers efforts to describe this as something other than a loan. It was actually the chief counsel advice that said, go with economic substance and not debt versus equity. Debt versus equity should be your secondary alternate position. And the parties were already proceeding. I don't want to say in tandem because they do overlap. I'm asking a legal question of whether it can't, I'm just saying in this case. Whether a substantial contribution can occur if information allows the IRS to stop going down a path that's been going and spending resources on and tells them no, concentrate here. I think that would be a substantial contribution. You just said that shut it down, shut down the equity, that equity argument. But that wasn't what happened here. The whistleblower information was not the basis of the chief counsel concluding that debt versus equity was not going to be first across the finish line. The strength of the various litigating positions was a separate question from the sufficiency of the evidence for each. And there was a- How can the strength of a position be separated from the sufficiency of the evidence? Because we're looking to make a tax assessment here. We're looking to make an adjustment. I understand that, but how can it be? How can it be separated from the sufficiency? I've never heard someone think that an argument or legal argument position can be separated from the evidence substantiating it. Let me be clear. You're making two different adjustments. You have compelling evidence in support of each. Some evidence is more compelling in support of theory A. Some evidence is more compelling in terms of theory B. Some evidence overlaps. Theory A allows you to make a larger tax adjustment. The strength of your evidence on theory B is immaterial to the fact that you want to go with theory A, which is equally well-founded, because you can collect more tax that way. That was what I meant to convey. And then didn't the chief counsel say it was 50- at least for- I could have them backwards- for ex-corporation 50-50 on your stronger theory? Chief counsel did not say that. Appeals said that. Appeals said that. 50-50 on your strongest theory. Right, and conceded debt versus equity completely. Conceded. The alternate theory. Rejected debt versus equity. Gave it away. Right. Let me shut down. You're able to shut that down and concentrate where you had- Let us focus. Maybe you're going to tell me how I'm mixing apples and oranges. The fact that appeals counsel said up front, look, this is a 50-50 proposition suggests that ultimately did prevail, that the role of information that plays- that new information that comes in from a whistleblower that contributes to get you to at least the 50-50 mark would be substantial. This isn't a case where, you know, this isn't a case where we had it locked down. We're going to get 90% from the appeals office. You'll tell me how this isn't what they do. We weren't- we had this lockdown without them, which seems to be the argument. But then appeals office seems to think this is anything but lockdown. This is a 50-50 proposition on your better argument. And were the whistleblower information salient in that determination by the appeals office as to the strength of the primary argument, then we would be in a different situation. And then that would be a harder question. Because, yeah, then we would be saying, yeah, you probably are playing some substantial role in the determination of the outcome here, which is coming out of the appeals office. And that's where we get the dollar amount of proceeds. We would normally be going off of an adjustment when we're measuring kind of substantiality. But that didn't happen here because the whistleblower information was not the basis on which appeals decided that there were 50-50 litigation hazards in settling the case based on an economic substance adjustment. The whistleblower information was not what the appeals office was concerned with. Remember, the whistleblower information had to do with how did the Dutch bank treat debt? Did it call it debt or did it call it- It seems to me it was also how the taxpayer in reality viewed what they were doing, because the application was from the taxpayer, correct? The credit application was from the taxpayer. Okay, so it's outing the taxpayer as to what it was doing. It's not just we're curious how some Dutch bank thought about this. It shows us how the taxpayer thought about this. Isn't that really important? It is, as the whistleblower office determined, a minor element far outweighed by the economic reality of the transactions themselves to the extent that it was of any significance. That is the extent of its significance as found by the whistleblower office who this court reviews for abuse of discretion. Do we review for abuse of discretion if it applied the wrong legal test? The wrong legal test would be a per se abuse of discretion, but it did not apply the wrong legal test here. For V Incorporated, it uses those words exactly, and it does so in a context where they say, yikes, the people that did this investigation are no longer here, so we're having trouble figuring out what the role of this was, but it didn't cause A, B, or C. End of story. Those were not the basis on which the award was rejected. The basis on which the award was rejected, and this is at page 103 of the appendix, was that the information provided by the whistleblower did not result in the collection of any proceeds from any of the taxpayers covered by the letter. It had nothing to do with, did we start an audit based on your information? Did we fulfill any of these other regulatory criteria? Initiate, expand the scope of, or continue to pursue but for your information. That was a heuristic applied within the whistleblower office, and still is. It's still in the regulation. It is simply an example rather than an only if test. It's gone now. Right. It wasn't then.  Okay, and so if their conclusion is, we don't know, it's hard to figure out what role this information played for V Corporation because the key players, it sounds like, were gone. We're no longer at IRS. You couldn't ask them. But it didn't do A, B, or C. And in fact, we'd already started the audit. That doesn't seem to analyze substantial contribution to end result at all. We knew that both of these taxpayers were coordinating and proceeding in parallel. We did, the whistleblower office was able to speak directly to the audit team members for X. They were not able to speak directly to the audit team members for B because those individuals had retired. But they had information already from X that said, this was not meaningful to us. This was helpful. It corroborated our views. But we had figured this out already. Like you said, it was locked in. They knew what their economic reasoning was going to be. In March of 2007, they had already drafted proposed adjustment language. And the actual proposed adjustments came out months before the chief counsel notice on both debt versus equity and economic substance that involved only, the whistleblower information was key only in the debt versus equity adjustment. Thank you very much, counsel. Ms. Muhammad, we'll give you two minutes. Thank you, your honors. Your honors, just a few points that I wanted to address. Counsel for the government said that what was ultimately proved was that this was just subterfuge. That was her words. When you look at what the IRS was looking at and what chief counsel advice was looking at and using to prove that this whole transaction was subterfuge, it was the Dutch bank credit applications. The chief counsel advice memo, when it says that this was a quote, disguise loan, it cites to the Dutch bank credit applications, because that was the most direct evidence that this was just a subterfuge and a sham transaction. And that's the ultimate point of economic substance. Was this a legitimate transaction or was it just a sham? Second point. Counsel for the government talks about debt versus equity and how there was one factor in the debt versus equity analysis that was changed. You won't see that in the economic substance notepads because those were entirely separate notepads from the debt versus equity notepads. So when the economic substance notepads are talking about the Dutch bank credit applications, they're only talking about them in the context of economic substance. Third point. Everybody knows you put your best evidence forward in your argument first. And that's exactly what the IRS did in its economic substance notepad when it said first in its argument that the Dutch bank credit applications disprove the taxpayer's intent, and they prove that this was really just a loan. Thank you, your honors. Thank you. Thank you to both counsel. The case is submitted.
judges: Millett; Katsas; Pan